**Opinion filed December 30, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00397-CV
_____

**LORI STEVENS, Appellant**

**V.**

**THOMAS STEVENS, Appellee**

**On Appeal from the 118th District Court**

**Howard County, Texas**

**Trial Court Cause No. 52889**

## M E M O R A N D U M   O P I N I O N

This is an appeal from a divorce proceeding that involved the custody of a minor child, S.M.S.  The day after the final hearing, which was conducted as a bench trial, the trial court notified the parties by letter that it would name the parents as joint managing conservators of the child with father, Appellee Thomas Stevens, as the parent with the right to establish the child's residence.  In response, mother, Appellant Lori Stevens, retained new counsel and filed a motion to reopen the

evidence and to reconsider. In a single issue on appeal, mother asserts that the trial court abused its discretion by denying her motion to reopen the evidence. We affirm.

*Pleadings*

Mother instituted the underlying proceedings by filing for divorce. She listed the couple's young daughter, S.M.S., as being affected by the suit. Father filed a counterpetition for divorce wherein he pleaded that he should be designated as the parent with the exclusive right to designate the child's primary residence.

*Final Hearing on Divorce*

At the final hearing, the only witnesses that testified were father and mother. Mother began her case by calling father as an adverse witness. When asked on direct examination why he thought it was in the child's best interest to be the parent to designate the child's primary residence, father testified that he would bring more stability to the child's life than what the mother could provide. Father further testified that shared custody, which had been in place since the trial court's temporary orders were entered in the case, was not working "great" because mother was late in getting the child to father when it was his turn for possession. Father also testified that the child was sometimes very upset when she arrived at his house. Father also cited mother's history of alcohol abuse, medical issues, and mental issues as other reasons why he should be designated as the parent to establish the child's residence.

On cross-examination, father's attorney further developed father's basis for seeking to be the parent to designate the child's residence. Father testified that mother had to go on FMLA leave from work in December 2014 because she "was having dizzy spells to the point of passing out." He also testified that mother worked three jobs, including a full-time job at the VA in Big Spring. Father stated that mother often took the child to work with her. Father further testified that the child

2

is often exhausted when in the mother's care and that the child was "very fussy" several times when he got the child from mother.

Father testified that mother took an antidepressant and anti-seizure medication. He also stated that one of mother's boyfriends was known to be a methamphetamine addict and that he had two DWI convictions. Father also testified that mother had been arrested for public intoxication and theft by check.

Father testified that he had obtained the records from Howard Cottage, the child's daycare provider, to determine which parent had picked up the child from daycare prior to the entry of the temporary orders. These records indicated that father had picked the child up seventy-three percent of the time. Father also testified that he took the child to a majority of her medical appointments. He opined that he had been the child's primary caretaker for the past six years. Father is a nurse manager at the state hospital in Big Spring, and he works 8:00 a.m. to 5:00 p.m. Monday through Friday. Father lives in his house that he owned prior to the marriage.

Father testified that his mother sometimes kept the child when the daycare was closed. He also testified that mother sometimes did not exercise her visitation with the child when she traveled out of town and that mother did not offer him the opportunity to have the child, but rather had others keep the child.

Father testified that mother has an older daughter who is eighteen. He stated that the daughter lives in Big Spring but that she only sees mother once a month. The older daughter currently lives with her father. Father testified that the older daughter originally lived with mother but that mother had problems with her and she started living with her father because of those problems.

Father testified that the "two days on and two days off" visitation schedule that the parties were following as a result of temporary orders had become

unworkable. He stated that it made the child exhausted. Father also testified that he carried health insurance on the child.

Father expressed concerns about mother based on comments she made to him in 2016 that if he did not come home from work, she would kill herself. He also testified that he observed mother slapping her older daughter. He also observed mother spank their child with a shoe or sandal, and he said that it would leave red welts on the child. He said that mother threatened the child with the sandal afterwards. Father concluded his testimony with his attorney by stating that the child had issues at school that necessitated her having to change schools.

When re-questioned by mother's attorney, father testified that mother had been fired twice for nonattendance at work. Father also testified that he was able to track mother's location because their auto insurance company had supplied them with GPS trackers for their vehicles in an effort to reduce their insurance rates. Father also clarified that the records from the daycare center was for when the parties were still living together.

Mother testified on direct examination that she went on short-term disability because of depression brought on by caring for a quadriplegic cousin and because the couple's child had been recently molested. She testified that her issue with passing out was the result of low blood sugar. Mother stated that she did not suffer from any conditions that hindered her present ability to care for the couple's child. Mother disagreed that father was the child's primary caregiver based on the fact that they had shared custody. Mother also testified that on her days to have the child, either she or her mother would pick up the child.

Mother testified that her public intoxication conviction occurred four years before the couple's child was born. As for the matter of taking their child to work with her, mother testified that she sometimes took her child to her second job to help

at the veterans' nursing home with dinner. Mother also testified that the child had very few doctor visits. Mother denied father's testimony that she had threatened to kill herself if he did not come home.

Mother testified that she did not think it would be in the child's best interest if the child resided with father because "she runs the show when she's over there." Mother stated that the child has no routine or structure when she is with father and that there is no consistency. Mother testified that the child comes back to her defiant and disrespectful and that it takes days for mother to get the child "back on track." Mother faulted father for not making their child sleep in her own bed. Mother testified that she had only had one boyfriend since the couple separated. She testified that they broke up because father was very controlling and had the boyfriend's neighbors spy on him. Mother testified that father was also very controlling with her.

Mother testified that father permits the child to push him around but that, then when father snaps, he "puts his hands on her." She testified about an incident when he left bruises on the child's back. Mother called CPS because of this incident, and she restricted father's overnight visits with the child.

Mother opined that father was making her out to be a bad person and a bad parent. She testified that contrary to father's testimony, she shares in the parenting of the child. Mother testified that it would be in the child's best interest to live with mother because mother provides more structure than father. She faulted the father's night routine, and she encouraged the child to do what father asked her to do when she is in his custody. Mother testified that the child had been expelled from school and daycare and that both times occurred during father's possession. Mother attributed the expulsions on father's lack of structure when he had custody of the

child. Mother concluded her direct testimony by testifying that the child's defiant behavior does not occur when mother has custody.

On cross-examination, mother testified that she refused to sign a request for consent to release her medical records because father was "just being nosy." She testified that her current health is the best it has ever been. Mother admitted to spanking the child with a sandal, but she denied leaving marks on the child. When asked about her older daughter, mother testified that the daughter did not like father, so she started living with her father. Mother described her relationship with her older daughter as "great" and said that she currently sees her older daughter often. Mother attributed the initial lack of seeing her older daughter on the fact that the daughter was upset with her and that the daughter was busy with school activities.

Mother denied being involved with a second boyfriend—the man that father described as a methamphetamine addict. Mother testified that she was just friends with this man, had tried to help him, and had stayed a night or two with him. She testified that he was no longer her friend because he continued to use drugs and she did not want this in her life anymore. Mother also testified about leaving her vehicle overnight at an establishment because she had been drinking. Mother also testified about a book reading program at school. She testified that on the logbook for the program, father logged ninety-seven times while she only logged thirteen times of reading to the child.

On redirect, mother testified about father's relationship with his other children. She described their relationship as nonexistent. She testified that these children slept all day, wore ill-fitting clothes, and did not have good hygiene. Mother also testified that father lost custody of his son because of a disagreement about school.

At the conclusion of the hearing, the trial court advised the parties that it was taking the matter of custody under advisement. The next day, the trial court issued a letter ruling wherein it announced that father would be the parent to establish the residence of the child. Approximately one month later, mother's new counsel filed mother's motion to reopen evidence.

*Motion to Reopen Evidence*

In the motion to reopen evidence, mother asserted that "critical evidence concerning the best interest of the child" was not presented to the trial court at the final hearing. In her motion, she sought to offer evidence from the following individuals: (1) Lucy Smith, the child's counselor; (2) Shawn Coskey, the director of the child's daycare; (3) Trish Clanton, a school counselor for the child; and (4) herself, in the form of "supplemental" testimony. In support of her motion to reopen evidence, mother attached letters and notes from Smith[1] and Coskey, records from the daycare, and mother's affidavit.

At the hearing on mother's motion to reopen evidence, the trial court informed the attorneys that in making its ruling on the motion to reopen, it would consider mother's summarization of what the new evidence would be. In addition to the testimony of mother, Smith, Coskey, and Clanton that was referenced in the motion to reopen, mother's counsel also informed the trial court at the hearing that she wanted to call G.D., mother's older daughter, as a witness. Mother's new counsel advised the trial court that she had reviewed the reporter's record from the final hearing and had concluded that, in her opinion, "minimal evidence" was presented at trial concerning the child's best interest.

Mother's counsel characterized the majority of the evidence presented at the final hearing as "irrelevant claims and unsubstantiated accusations" by father about

---

[1]The note from Smith was dated August 6, 2019, which was three weeks prior to the final hearing.

mother's character and parenting abilities. Mother asserted that father's testimony was "grossly inaccurate," irrelevant, misleading, and inadmissible, based largely on the fact that the testimony concerned matters that happened five years prior. She also asserted that father's testimony at trial—that he did the bulk of the parenting of the couple's child—was self-serving. Conversely, mother's counsel characterized mother's testimony at the final hearing as "undeveloped," and her arguments as "not clearly presented."

Mother asserted that Smith (the child's counselor) would provide "objective testimony" about the child's emotional and developmental needs and the parent that Smith felt was best able to meet those needs. Mother asserted that Smith would testify that mother was the parent best able to provide the structure that the child needed. Mother also asserted that Smith would testify that father had inappropriate parenting skills.

With respect to the additional testimony that mother would provide, mother asserted that she we would testify that father allegedly admitted to her that he had placed a hidden camera in G.D.'s room when G.D. lived with the couple. Mother's counsel also stated that she would like to call G.D. to testify about the same incident, as well as provide more accurate testimony about why she moved out of mother's home, including that she did not feel safe or comfortable living with father. Mother's counsel also stated that mother would testify that father uses control tactics to control the child. Counsel also stated that mother would offer testimony to clarify and rebut inaccurate accusations made by father at the final hearing.

Mother's counsel asserted that Clanton, the child's school counselor and bus driver during her kindergarten year, would testify that mother would pick up the child most every day to take her to daycare. Clanton would also testify about her observations of the child's interactions with each parent. Mother's counsel asserted

8

that Coskey would provide more complete evidence of the parent that picked up the child from daycare.

Mother's counsel asserted at the hearing on the motion to reopen that the trial court did not have sufficient evidence about the best interest of the child to support its determination that father should be the parent to designate the child's residence. Counsel also asserted that the "ordinary and technical rules" for reopening evidence should not be applied rigidly when the best interest of a child is at issue. In response to these arguments, the trial court noted that both Smith and Coskey had been subpoenaed for the final hearing and that both of them were present and available to testify. Mother's counsel responded that they should have been called as witnesses at the final hearing.

In announcing its decision to deny the motion to reopen evidence, the trial court stated that it had also reviewed the reporter's record from the final hearing. The trial court noted that the final hearing was hotly contested "on both sides." The trial court then permitted mother to make an offer of proof of the evidence it would offer had the trial court granted the motion to reopen.

With respect to Smith, mother additionally noted that she had seen the child for thirteen one-hour sessions with the initial complaint being that the child was defiant and would hit and kick father and kids at school. Mother stated that Smith would testify that father seems to encourage the child's negative behavior, that the child is better behaved with mother, and that mother is better able to provide for the child's needs. With respect to mother's supplemental testimony, mother's counsel stated that mother would testify that she moved out because of the constant fighting between father and the child. Mother would also testify that father would lose his patience with the child, and that he would forcefully and physically restrain her in a

way that would leave bruises on her. Mother would also testify that the child is less stressed when she is in mother's possession.

After the trial court denied the motion to reopen evidence, it subsequently entered a final decree of divorce consistent with its letter ruling and named father as the parent with the exclusive right to designate the child's residence.

*Analysis*

In her sole issue on appeal, mother asserts that the trial court abused its discretion by denying her motion to reopen evidence. Rule 270 of the Texas Rules of Civil Procedure provides that a trial court may permit additional evidence to be offered at any time when it clearly appears necessary to the administration of justice. Tex. R. Civ. P. 270. Rule 270 allows, but does not require, the court to permit additional evidence. *Hernandez v. Lautensack*, 201 S.W.3d 771, 778–79 (Tex. App.—Fort Worth 2006, pet. denied); *Naguib v. Naguib*, 137 S.W.3d 367, 373 (Tex. App.—Dallas 2004, pet. denied); *Lopez v. Lopez*, 55 S.W.3d 194, 201 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.). It is within the trial court's discretion to permit the reopening of a case for the purpose of admitting additional evidence. *Naguib*, 137 S.W.3d at 372. Unless the trial court has clearly abused its discretion, an appellate court should not disturb the trial court's refusal to reopen a case for the purpose of admitting additional evidence. *Id.*

In determining whether to permit additional evidence, a trial court may consider the following factors: (1) the moving party's due diligence in obtaining the evidence; (2) the decisiveness of the proffered evidence; (3) any undue delay the reception of the evidence could cause; and (4) any injustice the granting of the motion could cause. *Id.* at 373. If all of the factors are not satisfied, a trial court's ruling on a party's motion to reopen the evidence should not be disturbed. *Id.*

The primary factor that we must consider in this appeal is the matter of diligence. There is no question but that the additional evidence that mother sought to offer was available to her at the time of the final hearing. As noted by the trial court, both Smith and Coskey had been subpoenaed and they, along with mother, were present and available to testify. A trial court does not abuse its discretion by refusing to reopen a case after evidence is closed if the party seeking to reopen has not shown diligence in attempting to produce the evidence in a timely fashion. *Hernandez*, 201 S.W.3d at 779; *Estrello v. Elboar*, 965 S.W.2d 754, 759 (Tex. App.—Fort Worth 1998, no pet.). Simply put, "the interests of justice do not warrant a second bite at the apple." *Estrello*, 965 S.W.2d at 759.

Mother asserts that the diligence requirement should not be rigidly applied to her situation because the additional evidence that she sought to offer bears on the best interest of the child. She cites two older cases for this proposition: *Russell v. Russell*, 443 S.W.2d 569 (Tex. App.—El Paso 1969, no writ), and *C. v. C.*, 534 S.W.2d 359 (Tex. App.—Dallas 1976, writ dism'd w.o.j.).

*Russell* was a divorce case wherein custody of the parties' children was the primary issue. 443 S.W.2d at 570. The El Paso Court of Appeals determined that the trial court abused its discretion by not reopening the evidence because it clearly appeared to be necessary to the due administration of justice. *Id.* at 571. The court noted that the paramount issue before the trial court was the welfare of the children, and that little evidence was presented on behalf of the children. *Id.* In that regard, the mother did not appear for the final hearing. *Id.* at 570. The trial court announced that a portion of the evidence would be received that day but that the case would be continued until a later date to permit the mother to appear. *Id.* When the trial resumed, the father requested to withdraw his previous statement that he had rested because he wanted to present additional evidence. *Id.* The trial court denied this

request. In reversing the trial court, the court of appeals noted that the trial court "needed all the help it could get" on the custody issue and that the evidence on this question was meager. *Id.* at 571.

*C. v. C.* was also a divorce case that involved a custody dispute. 534 S.W.2d at 360. The parties tried the custody issue to a jury, and it ruled in favor of the father. *Id.* Afterwards, the mother retained new counsel to file a motion for new trial. *Id.* New counsel alleged in the motion for new trial that the father had a violent temper and that he disciplined the children harshly and cruelly. *Id.* The Dallas Court of Appeals noted that this evidence had not been offered at trial. *Id.*

In reversing the trial court, the court of appeals held that the ordinary rules for granting a new trial for newly discovered evidence should not be rigidly applied in child custody proceedings. *Id.* at 361. The court based its decision on the fact that the children in a custody dispute are the real parties in interest and that the counsel for the parents cannot necessarily be relied upon to protect the children's interest. *Id.* The court further noted that the additional evidence that the mother sought to introduce essentially consisted of acts that constituted child abuse. *Id.* at 362. The court limited its holding to situations wherein the additional evidence sought to be offered "strongly shows that the original custody order would have a seriously adverse effect on the interest and welfare of the children, and that presentation of such evidence at another trial would probably change the result." *Id.*

We conclude that the holdings in *Russell* and *C. v. C.* are distinguishable. Unlike the situation in *Russell*, the evidence at the final hearing on the question of custody was not meager. As we detailed above, the bulk of the testimony at the final hearing focused on which parent should be designated as the parent who would primarily have custody of the child. Each parent presented evidence at the final hearing as to why each of them felt that he or she should be the parent with primary

12

custody. *C. v. C.* is distinguishable because the additional evidence that mother sought to present here would not probably have changed the result reached after the final hearing. We note in this regard that the trial court served as the factfinder at the final hearing, rather than a jury as was the case in *C. v. C.* Thus, implicit within the trial court's consideration of the additional evidence that mother sought to offer in her motion to reopen the evidence was that the additional evidence would not have changed the trial court's initial custody determination.

The most disturbing additional evidence that mother sought to offer concerned the allegation that father had installed a video camera in her older daughter's bedroom. However, mother made no reference to this evidence at the final hearing despite the fact that her relationship with her older daughter was discussed at the final hearing. It is also significant to note that, in her affidavit attached to the motion to reopen evidence, mother made no mention or reference to father installing a video camera in the older daughter's bedroom. The testimony that mother sought to introduce from Smith detailed her conclusions that mother provided more structure than did father for the child and that mother would be the better parent to have primary custody of the child. In many respects, the additional testimony from Smith was cumulative to mother's testimony at the final hearing that mother provided more structure for the child.

Based on this record, we cannot conclude that the trial court abused its discretion by denying mother's motion to reopen the evidence. To hold otherwise would be giving mother "a second bite at the apple" after she learned how the trial court intended to rule after the final hearing. *See Estrello*, 965 S.W.2d at 759. As it noted on the record, the trial court had reviewed the reporter's record from the final hearing prior to the hearing on the motion to reopen evidence. Thus, the trial court was cognizant of the extensive evidence presented by the parties at the final hearing

on the custody issue, as well as the lack of impact the additional evidence would have had on the trial court's initial custody determination. Accordingly, we overrule mother's sole issue on appeal.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


December 30, 2021

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.